# In the United States Court of Federal Claims

No. 18-1822C

(Filed: June 14, 2021)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | |
| **BOWMAN CONSTRUCTION CO.,** | * | |
| | * | Motion to Dismiss; Contract |
| Plaintiff, | * | Disputes Act; Statute of |
| | * | Limitations; Termination for |
| v. | * | Default; Surety; Failure to Present |
| | * | Claim to Contracting Officer; |
| **THE UNITED STATES,** | * | Vague Claims. |
| | * | |
| Defendant. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * | | |

Spencer L. Sears, Erin Frazee Masini, Fox Rothschild LLP, 1030 15th Street, N.W., Suite 380 East, Washington, D.C. 20005, for Plaintiff.

Jeffrey Bossert Clark, Robert E. Kirschman, Jr., Patricia M. McCarthy, Michael Duane Austin, United States Department of Justice, Civil Division, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant. Alexander Fichtel, United States Department of the Interior, Of Counsel.

_____

**OPINION, ORDER OF PARTIAL DISMISSAL, AND
ORDER TO SHOW CAUSE**

_____

**WILLIAMS**, Senior Judge.

Defendant seeks dismissal of this Contract Disputes Act ("CDA") case on statute of limitations grounds. In October 2012, the contracting officer issued a final decision terminating for default Plaintiff's contract for construction of a bicycle trail in Voyageurs National Park, Minnesota. Although Plaintiff was required to appeal that decision within one year under the CDA, Plaintiff did not take any action to challenge that decision until some five years later in October 2017. Then, in what it characterized a "claim," Plaintiff argued that the Government wrongfully terminated its contract and sought $837,759.21 representing reimbursement of the amounts its Surety paid for excess reprocurement costs, as well as unpaid invoices, costs of services and materials, work done by subcontractors, extended overhead, and "loss of bonding power" and future Government work. The Government denied this 2017 claim, and Plaintiff appeals the denial in this Court.

Defendant argues that this action, filed in 2018, is an untimely challenge to the 2012 decision terminating the contract for default. The Court agrees that Plaintiff was required to file

an appeal of the termination decision within one year under the CDA and failed to do so, making Plaintiff's attempted challenge to the termination decision time-barred. Nor can Plaintiff maintain an action to recover the amount that its insurer, Old Republic Surety Company ("Surety"), paid the Government due to Plaintiff's default. Plaintiff has not established the jurisdictional predicate for this claim as the Government never asserted a CDA claim for excess reprocurement costs and Plaintiff never appealed a contracting officer's final decision assessing those costs. Rather, the Surety paid those costs standing in Plaintiff's shoes, and Plaintiff acquiesced in that payment by confessing judgment in favor of the Surety in state court. In this action, Plaintiff also asserts claims for lost profits stemming from the alleged bad-faith termination and for home office overhead, but these claims were never presented to a contracting officer and must be dismissed.

Plaintiff's claim for unpaid invoices survives the motion to dismiss because Plaintiff has alleged that these invoices cover work performed and accepted prior to the termination.

The Government contends that the remaining elements of this action and Plaintiff's 2017 claim -- costs for surveying, subcontractor work, stump removal, erosion and stabilization fabrics, supervisor labor, extended overhead, and additional clearing work -- are also challenges to the termination for default dressed up as separate monetary claims and that an appeal of the denial of those claims is time-barred. The Court cannot resolve this aspect of the Government's argument because Plaintiff has failed to articulate the bases for these claims. As such, the Court defers resolving Defendant's motion as to those claims pending further development of the record.

## **Background**[1]

### **The Solicitation**

On July 13, 2011, the National Park Service issued a solicitation seeking bids for construction of a 1.78 mile-long, 10-foot wide paved bicycle trail in Voyageurs National Park near International Falls, Minnesota. The procurement was a "100% Total Small Business set-aside." ECF No. 73-1 at 2. Bidders were required to submit bids for 30 line items and, if selected, were to provide "all labor, equipment, supervision and materials necessary" for construction of the bike trail. Id. at 7; ECF No. 73-3 at 3. The line items included materials and services, such as geotextile fabrics, rip rap and barrow, aggregate base, bituminous concrete pavement, turf establishment, rock blasting, clearing, stump removal, surveying and staking, and construction of temporary access drives and a parking area.

The solicitation stated:

B.2 BID SCHEDULE

. . .

Submit bid for all items; failure to do so may render the bid non-responsive. On lump-sum bid items, provide total price only; on unit price bid items, provide the unit price and the extended amount of bid.

---

[1] This background is derived from the Second Amended Complaint, appendices and exhibits to the parties' filings, and admissions during oral argument.

2

> Quantities for unit price items are estimated, but payment will be made only for actual quantities of work completed.

ECF No.73-1 at 7.  On August 15, 2011, Plaintiff, Bowman Construction Company, Inc. ("Bowman"), submitted its bid in the amount of $1,204,902, and on September 22, 2011, the National Park Service awarded Plaintiff Contract No. P11PC60388 ("the Contract").

**Performance**

The agency issued a notice to proceed on October 24, 2011.  As of an October 24, 2011 construction meeting, performance "proceeded in a timely fashion with surveying discrepancies, blasting plans and protocols, approval of class 5 barrow and field adjustments amicably resolved." ECF No. 64-1 at 2.  On December 12, 2011, due to "winter weather conditions, the Government halted work at approximately one-third completeness."  Second Am. Compl. ¶ 30; see Answer ¶ 30; ECF No. 37-7 at 1.

During the winter shutdown, the parties met and discussed a potential need for more topsoil, and issues with parking area grades, drainage, and slopes.  On March 19, 2012, the parties agreed on Amendments 0001 and 0002 "to increase and adjust unit measurements and volumes." ECF No. 64-1 at 3.

Work on the project resumed on April 30, 2012.  In mid-April 2012, the parties discussed "the contract limitation on imported common and granular barrow," and in May, Plaintiff informed contracting officer ("CO") S. Dale Allen that it would exceed the barrow limitation.  Id. at 3-4. On May 22, 2012, the contract specialist, Karen Thomas, advised Plaintiff that she would issue Amendment 0003 to the Contract, allowing for an additional 3,600 tons of barrow, and granting a price increase based on a cost of $10 per ton.

It appears that between June 11 through September 29, 2012, no work was performed on the bike trail, and that on June 14, 2012, Plaintiff removed its machinery and workers from the worksite.

On July 18, 2012, the contracting specialist issued Amendment 0003 apparently increasing granular barrow and agreeing to pay an additional $35,000.[2]  The parties continued to have disputes into August 2012, regarding additional fill material and grade slopes.  On August 4, 2012, the Government issued Amendment 0004, providing an unspecified payment for an additional 1,743 tons of granular barrow.

On August 15, 2012, Plaintiff advised the contracting officer that it would "not submit a fixed price to shape the slopes of the bike trail.  There are no 'true grades' to meet: ….only the whim of your inspector David Draipsa [sic]."  ECF No. 64-1 at 6.  In response, on August 22, 2012, CO Allen advised Plaintiff that "the Default Clause for fixed price contracts would be used" if Plaintiff did not restart work on the bike trail using on-site fill.  Id.  On August 26, 2012, Plaintiff replied that it was unable to continue work until the Government clarified the slope grades, addressed the insufficient fill on site, and guaranteed the unit price Plaintiff would be paid for work under these unit price line items.

---

[2]     Amendment 0003 is not in the record.

3

On September 4, 2012, the Government notified Plaintiff that it was required to have a site superintendent at the parking lot worksite. On September 13, 2012, after receiving no response from Plaintiff, the Government issued a stop work order for work on the parking lot "for failure to provide proper oversight of the construction project." ECF No. 78-1.

**The Cure Notice and Termination**

On September 12, 2012, the Government issued a cure notice with respect to work on the bike trail. The cure notice warned Plaintiff that the Government considered Plaintiff's "failure to prepare the trail to permit proper installation of bituminous asphalt" as "endangering performance of the contract" and that the Government "may terminate for default." ECF No. 87-1 at 1. The cure notice gave Plaintiff 30 days to cure deficiencies and stated that it was "the Government's position that no additional fill material should be delivered to the site as there are substantial amounts of fill material already at the site to complete work." Id.

On September 12, 2012, Plaintiff responded to the cure notice, stating that the Government had failed to respond to its "letter requesting detailed information on how to modify the grade and slopes." ECF No. 71-1.

At the expiration of the cure notice on October 15, 2012, the Government terminated Plaintiff's contract for default, stating in pertinent part:

(2) The acts or omissions constituting the default are as follows:

. . . . Since receiving the cure notice, Bowman has only deployed one CAT 320CL excavator (trackhoe), one heavy equipment operator, and one supervisor for three and one half days between October 1 and October 4, 2012 and worked between stations 16+00 and 59+50 to balance fill material and shape side slopes of the embankment. Bowman has specifically failed to cure the following performance defects:

    a. Balance and shape embankment, side slopes, aggregate sub-base and base-course to the lines, grades, and details shown on the drawings and approved field changes.

       . . .

       No areas of the bike trail were reworked for thickness and grades. Not all areas reworked uniformly conform to tolerances for line and width.

    b. Reduction of the material to the range of sizes specified and at no additional cost to the Government.

       . . .

    c. Fill voids with smaller rocks and finer aggregate to form dense, compact mass, ready to receive topsoil.

       . . .

      d.  Remove trees and brush from the footprint of bike trail. Mark the toe of slopes so that the Government can determine what trees selected to be preserved lay within the footprint of the bike trail.

         . . .

      e.  Install topsoil as specified.

         . . .

      f.  Employ the services of a Minnesota licensed surveyor for surveying and measuring quantities.

         . . .

      Grade finishing stakes are only partially installed, with gaps in the survey where no grade finishing stakes are installed.

      Toe of slopes are not surveyed.

(3) The contractor's right to proceed further under this contract is hereby terminated.

(4) The construction services having been terminated may be purchased against the contractor's account, and the contractor will be held liable for any excess costs.

(5) The contracting officer has determined that the failure to perform is not excusable, and this notice of termination constitutes this decision, and the contractor has the right to appeal the decision under the disputes clause 52.249-10.

(6) The Government reserves all rights and remedies provided by law or under the contract, in addition to charging excess costs.

(7) This notice constitutes a decision that the contractor is in default as specified and that the contractor has the right to appeal under the disputes clause 52.249-10.

ECF No. 73-4 at 2-4.

**The Surety Settles with the Government**

After the termination for default, Plaintiff's Surety attempted to negotiate with the Government to allow the Surety to utilize Plaintiff as the Surety's completion contractor.

On July 1, 2013, Carl Bowman, the owner of Bowman Construction Company, Inc., proposed to finish the bike trail for the original contract price of $1,204,902, under the following conditions:

    1) We will design all alignment and grade changes and submit to Park Service for approval

    2) Slopes will be variable using material already on project - no more material to be hauled in.

    3) Only one culvert will be extended - The 42" span

> 4) Bike parking lot granite pavers to be installed per original mock-up
>
> 5) Half of withheld retainage to be paid immediately and 5% to be held until completion.
>
> Survey work for design of trail alignment could begin as soon as redesign is accepted by Park. Construction would take 8 weeks to complete.

ECF No. 64-1 at Bow_0001038. Plaintiff did not receive a response from the Government.

On October 9, 2013, the Surety informed Plaintiff that the Government was not willing to discuss "the problems which [Plaintiff] has stated exist with the plans and specifications," and "continues to demand the full bond penal sum." Id. at Bow_0001034. The Surety stated it was "moving forward to rebid the contract." Id.

Subsequently, the Government estimated the costs for completion to be $754,600 and "made demand upon the Surety to remedy the default of [Plaintiff] on the Project and to complete or procure completion of the work under the Contract for the Project." ECF No. 43-1 at Appx. 5.

On April 1, 2014, the Surety entered into a settlement agreement with the Government and agreed to pay a lump sum of $316,653.99 and acknowledged the Government's retention of the Contract balance of $437,946.01 in full satisfaction of all claims. In the Agreement, the Surety acknowledged that Plaintiff "defaulted in the performance of" the Contract and that Plaintiff's "right to proceed with the work was terminated." Id. at Appx. 5. The Agreement provided that in consideration of the $316,653.99 payment and the Government's retention of the Contract balance of $437,946.01, the Government released the Surety from all claims.

**The Surety Sues Bowman, and Bowman Confesses Judgment**

On September 9, 2014, the Surety brought suit against Bowman Construction Company, Inc. and its principals in Minnesota State District Court, Koochiching County, to recover the costs it paid to the Government. On June 1, 2015, Bowman entered a Confession of Judgment agreeing to pay the Surety $316,000 plus 10% interest per annum for the Surety's losses arising from the Government's claim on the bond and its settlement payment. Id. at Appx. 9-13; see Minn. Stat. § 548.22 (2020); Majestic Inc. v. Berry, 593 N.W.2d 251, 255 (Minn. Ct. App. 1999); Miller v. Shugart, 316 N.W.2d 729, 735 n.6 (Minn. 1982). In the Confession of Judgment, Bowman expressly agreed that $316,000 plus interest was due to the Surety, that the Government had "terminated Bowman Construction's contract," and at the time of termination, "the Project was not complete." ECF No. 43-1 at Appx. 10-11.

**Plaintiff's 2017 Certified Claim**

On October 17, 2017, some five years after the termination for default and over two years after confessing judgment in favor of the Surety, Plaintiff submitted what it styled a "certified claim" to the contracting officer requesting $837,759.21 "resulting from wrongful termination," stating:

- "[t]he engineered drawings submitted with the invitation for bids were insufficient to calculate the depth of blasting for rock removal or the quantities of imported barrow required for finished grades;"

6

- "[t]he engineered drawings submitted with the invitation for bids were not based on a formal survey" so "elevations and slopes were estimated without proper verification;"

- "[t]he elevation of the bicycle trail and culverts were laid consistent with the elevations specified in the [Government's] drawings," which caused the trail elevation to be "12 to 20 inches above the elevation of the existing County roadway surface" and required "longer culverts and increased volume of imported barrow;"

- "[f]ield adjustments to accommodate differing site conditions and prompt contract modifications were required in order to allow contract completion," which CO Allen refused;

- Plaintiff's failure to satisfy the issues in the cure notice should have resulted in a termination for cost reimbursement under FAR 52.249-6 instead of termination for default under FAR 52.249-10; and

- the September 13, 2012 stop work order was "without fact or justification" and gave Plaintiff "only 14-days to meet the conditions of the Cure Order."

ECF No. 64-1 at 1, 7-10.

Plaintiff included the following chart of damages:

**Bowman vs VNP ~ Damages**

| # | Item | Amount |
|---|------|--------|
| 1 | Pay estimate #5<br>• Account Paid | $877,477.02<br>(-)$788,423.01<br>$89,054.01 |
| 2 | Bond cost not paid for | $1,204,902.00<br>$788,423.00<br>$416,479.00<br>X 2%<br>$8329.58 |
| 3 | Stump Removal (500 X $400) | $200,000.00 |
| 4 | Survey mistake | $751.00 |
| 5 | Additional work performed by Sub-contractors Pelland-Swenson | $25,000.00 |
| 6 | Supervisor (Start 09/20, $1000/day, plus $250/day-vehicle)<br>• 09/24 – 09/28 = 5 days<br>• 10/01 – 10/05 = 5 days<br>• 10/08 – 10/12 = 5 days<br>• 15 days @ $1250 | $18,750.00 |
| 7 | Legal Fees – *reserved* | |
| 8 | Erosion fabrics – perishable | $8,859.00 |
| 9 | Extended OH<br>• Carl time<br>• TC stuff | $20,000.00 |
| 10 | Additional clearing – 2 acres @ $3000 each | $6,000.00 |
| 11 | Sub-contractor Sjoblom Landscape | $25,000.00 |
| 12 | Roof Fabric | $20,000.00 |
| 13 | Reimbursement to Bonding Company; Old Republic Surety Company | $316,000.00 |
| 14 | *Sub-total* | $737,759.21 |
| 15 | (+) Charges[2] | $100,000.00 |
| 16 | (+) Legal Fees | |
|   | **Grand Total:** | **$837,759.21** |

[2] Loss of bonding power & future work by government

ECF No. 73-5 at 11.

On December 11, 2017, the Government responded that it viewed Plaintiff's claim "as an appeal of the Contracting Officer's Final Decision," i.e. the termination decision of October 15, 2012, and stated it was "not the proper entity to resolve [Plaintiff's] appeal." ECF No. 73-6. On November 28, 2018, Plaintiff filed this action.

8

**Discussion**

**Legal Standards**

Defendant filed a motion to dismiss Plaintiff's Complaint for lack of subject-matter jurisdiction.³ ECF No. 43. Subject-matter jurisdiction is a threshold matter which Plaintiff must first establish before the Court may proceed to the merits of the action. Hardie v. United States, 367 F.3d 1288, 1290 (Fed Cir. 2004); K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015). The Court must dismiss the action if subject-matter jurisdiction is found to be lacking. Adair v. United States, 497 F.3d 1244, 1251 (Fed. Cir. 2007). A plaintiff must establish subject-matter jurisdiction by a preponderance of the evidence. Securiforce Int'l Am., LLC v. United States, 879 F.3d 1354, 1359 (Fed. Cir. 2018); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988); Tindle v. United States, 56 Fed. Cl. 337, 341 (2003).

Under the CDA, a contractor has six years to submit a claim to the contracting officer for a final decision. 41 U.S.C. § 7103(a)(4)(A). "A claim need not 'be submitted in any particular form or use any particular wording . . . [, but it must provide] a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim.'" K-Con Bldg. Sys., Inc., 778 F.3d at 1005 (quoting Cont. Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987)). A claim accrues under the CDA as of "the date when all events, that fix the alleged liability of either the Government or the contractor and permit assertion of the claim, were known or should have been known." Elec. Boat Corp. v. Sec'y of Navy, 958 F.3d 1372, 1375 (Fed. Cir. 2020).

Once a final decision has been issued, a contractor has 12 months to bring an appeal in this Court. 41 U.S.C. § 7104(b)(3). The appeal must be "based on the same claim previously presented to and denied by the contracting officer." Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003) (quoting Cerberonics, Inc. v. United States, 13 Cl. Ct. 415, 417 (1987)); 41 U.S.C. § 7104(b)(3).

It is an open question whether the one-year statute of limitations in the CDA is jurisdictional. Nussbaum v. United States, 145 Fed. Cl. 5, 10 (2019) (citing Guardian Angels Med. Serv. Dogs, Inc. v. United States, 809 F.3d 1244, 1252-53 (Fed. Cir. 2016)); see Guardian Angels, 809 F.3d at 1252 ("Nor need we decide whether compliance with the twelve-month filing period set out in section 7104(b)(3) is a jurisdictional requirement."); Creative Mgmt. Servs., LLC v. United States, 989 F.3d 955, 961 (Fed. Cir. 2021) ("Indeed, we have questioned whether compliance with the twelve-month filing period in § 7104(b)(3) is a jurisdictional requirement."). Nonetheless, because Defendant has raised its motion under Rule 12(b)(1), the Court applies procedures under that Rule to resolve this motion. See, e.g., Nat'l Air Cargo Grp., Inc. v. United States, 127 Fed. Cl. 707, 715 n.6 (2016) ("[W]hen a court reviews a complaint under a factual attack, the allegations have no presumptive truthfulness, and the court . . . has discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts." (internal citation omitted)); 2 James Wm. Moore, Moore's Federal Practice § 12.30[3], at

---

³ In its response to Plaintiff's supplemental brief, Defendant states that "the Court lacks jurisdiction over all of Bowman's 'claims' because they are directly related to the termination which Bowman did not timely appeal," but "given Bowman's shifting positions, the Court may treat our motion regarding the remaining counts [Counts I, II, and III] as a failure to state a claim. See, e.g., Palmer v. United States, 168 F.3d 1310, 1313 (Fed. Cir. 1999)." ECF No. 74 at 6 n.2.

12-45 (3d ed. 2012) ("[U]nlike a Rule 12(b)(6) dismissal, the court need not confine its evaluation to the face of the pleadings, but may review or accept any evidence, such as affidavits, or it may hold an evidentiary hearing."); Swartzlander v. United States, 142 Fed. Cl. 435, 437 n.2 (2019) (holding an evidentiary hearing to resolve Defendant's motion to dismiss a takings case on statute-of-limitations grounds), aff'd, 811 F. App'x 616 (Fed. Cir. 2020).

**Plaintiff's Challenge to the Termination for Default Is Time-Barred.**

In its Second Amended Complaint, Plaintiff asserts three counts: (1) Breach of Contract: Failure to Make Payment; (2) Breach of Contract: Improper Termination of Contract; and (3) Breach of the Covenant of Good Faith and Fair Dealing. In response to the Second Amended Complaint, Defendant reasserted its original motion to dismiss.

Plaintiff's attempt to appeal the contracting officer's final decision terminating its contract for default in this action is untimely. A termination for default is a government claim not subject to contracting officer presentment under the CDA. Securiforce, 879 F.3d at 1363. A contractor may appeal a contracting officer's final decision either at the United States Court of Federal Claims within 12 months of issuance of the decision or at the appropriate board of contract appeals within 90 days. 41 U.S.C. § 7104(a), (b)(3); Guardian Angels, 809 F.3d at 1247-48. On October 15, 2012, CO Allen issued his termination for default decision. In his decision, CO Allen stated: "[t]he contracting officer has determined that the failure to perform is not excusable, and this notice of termination constitutes this decision, and the contractor has the right to appeal the decision under the disputes clause 52.249-10." ECF No. 73-4 at 3.

The statute of limitations began to run with the issuance of CO Allen's October 15, 2012 decision. See Guardian Angels, 809 F.3d at 1248. As the Federal Circuit has explained: "[a]lthough a termination for default is deemed to be a government, rather than a contractor, claim, . . . the linchpin for the start of the statutory appeal period is a final decision by a contracting officer terminating a contract for cause." Id. Under the one-year statute of limitations in 41 U.S.C. § 7104(b)(3), Plaintiff's deadline to appeal the termination for default was in mid-October 2013, and its attempt to challenge the termination for default in this action some five years later is untimely. Allen v. United States, 140 Fed. Cl. 550, 559 (2018) ("The CDA 'contains a one-year statute of limitations that applies to appeals to this court from the final decisions of contracting officers.'" (internal citations omitted)).

**Plaintiff Cannot Recover the Surety's Payment in This Action.**

In Count II, "Breach of Contract: Improper Termination of Contract," Plaintiff alleges that it "did not default in its performance" and, citing what it terms the Government's "improper and bad faith termination," seeks damages of $316,653.99 to recoup the Surety's payment for excess reprocurement costs as well as $57,123.39 "for lost profit[s] on balance of incomplete work." Second Am. Compl. ¶¶ 90-93.

Once the termination for default was not timely challenged, it became effective, and the landscape of Plaintiff's and the Government's rights were dictated by that termination. 41 U.S.C. § 7103(g); see, e.g., Z.A.N. Co. v. United States, 6 Cl. Ct. 298, 305 (1984) ("Accordingly, inasmuch as the contractor did not timely appeal the . . . decision, the determination of default, inter alia, is now final and not subject to review in this tribunal."). Indeed, the parties' recognition of the efficacy of the termination for default is demonstrated by their course of dealing. Once

10

Plaintiff defaulted, the Government had to obtain completion of the work and sought payment from the Surety for such excess reprocurement costs.[4]  FAR 52.249-10(a) ("The Contractor and its sureties shall be liable for any damage to the Government resulting from the Contractor's refusal or failure to complete the work within the specified time," including "any increased costs incurred by the Government in completing the work.").  Plaintiff paid excess reprocurement costs resulting from the termination via its Surety and reimbursed the Surety for those costs by confessing judgment in a state court action brought by the Surety.

There is no basis to permit Plaintiff in this litigation to revisit either its Surety's payment of excess reprocurement costs or Plaintiff's voluntary judgment reimbursing the Surety.  There is no contracting officer's final decision assessing reprocurement costs (and no appeal of such decision) as the Government never filed a CDA claim for excess reprocurement costs, since the Surety, standing in Plaintiff's shoes, paid the Government its requested $316,653.99 representing excess reprocurement costs.  As such, Plaintiff cannot recover the $316,653.99 that the Surety paid the Government due to Plaintiff's default.

### **Plaintiff Cannot Recover Lost Profits on Incomplete Work on Its Defaulted Contract.**

In Count II, Plaintiff further alleges:

> Due to the Government's bad faith decision to terminate for default and mismanagement of the contract, [Plaintiff] also incurred $57,123.39 in damages for lost profit on balance of incomplete work.

Second Am. Compl. ¶ 93.  Plaintiff's claim for "lost profit on balance of incomplete work" fails for two reasons.  First, as a general matter, a contractor terminated for default cannot recover lost profits on work in progress.  See J. Parr Constr. & Design, Inc. v. United States, 24 Cl. Ct. 228, 232 n. 2 (1991), aff'd, 996 F.2d 319 (Fed. Cir. 1993); Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 475 (1993) (holding that "[a]ny recovery of profits on a default terminated contract is limited to earned profit on work actually performed prior to the termination" and noting that "[a]nticipated but unearned profit is not recoverable, even under a termination for the convenience of the government"); FAR 52.249-2(f) (stating even under a termination for convenience, profit is for "work done").

Second, even assuming that an allegation of a "bad faith" termination for default would give rise to a separate monetary claim seeking different relief than a conversion to a termination for convenience, such a claim was not presented to the contracting officer here.  See BTR Enterprises of SC, LLC v. United States, No. 18-215C, 2018 WL 4102586, at *10 (Fed. Cl. Aug. 29, 2018) (dismissing a contractor's action alleging that a wrongful convenience termination was motivated by bad faith because the contractor did not raise bad faith in its CDA claim challenging that termination); see generally Securiforce, 879 F.3d at 1362 (noting that "when the defenses 'seek the payment of money,'" the claim must be presented to a contracting officer for a final decision (quoting Laguna Constr. Co. v. Carter, 828 F.3d 1364, 1368 (Fed. Cir. 2016))).  In its Second Amended Complaint Plaintiff alleged that the Government's "improper and bad faith termination for default constitute[d] a material breach of the Government's obligations under the Contract," but Plaintiff never timely challenged the termination and never mentioned "bad faith"

---

[4]  During oral argument, Plaintiff's counsel indicated that the Government hired a different contractor to complete the work.  Oral Arg. Tr. at 51; see also ECF No. 37-5.

11

in its 2017 claim to the contracting officer.  ECF No. 64-1; Second Am. Compl. ¶ 95.  Because Plaintiff never presented this claim to the contracting officer, this Court lacks jurisdiction over the claim.  41 U.S.C. § 7103(a); Scott Timber Co., 333 F.3d at 1365; Emiabata v. United States, 792 F. App'x 931, 935 (Fed. Cir. 2019) ("The CDA provides that '[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision.'  We have interpreted this 'presentment' requirement to be a 'jurisdictional prerequisite to further legal action.'" (quoting 41 U.S.C. § 7103(a)(1) and Sharman Co. v. United States, 2 F.3d 1564, 1568 (Fed. Cir. 1993), overruled on other grounds Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995))); M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1327 (Fed. Cir. 2010) ("This Court has found that jurisdiction thus requires both a valid claim and a contracting officer's final decision on that claim."); James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1543 (Fed. Cir. 1996) ("[T]he CDA also requires that all claims be submitted to the contracting officer for a decision.").

Count II of Plaintiff's Second Amended Complaint is dismissed.

### In Count III Plaintiff Reiterates a Time-Barred Challenge to the Termination and Fails to Plead Monetary Damages Tied to Its 2017 Claim.

In Count III, Plaintiff again attempts to challenge the termination for default -- this time alleging that the termination constituted a breach of the Government's duty of good faith and fair dealing.  Plaintiff alleges the Government refused to comply with the Contract, by "repeatedly attempt[ing] to compel" Plaintiff to take on unspecified "lump sum obligations" that were "contrary to the plain terms of the Contract," issuing a Stop Work order one day after issuing a cure notice, and terminating the Contract with unspecified "outstanding payments remaining."  Second Am. Compl. ¶¶ 99-101.  These allegations all relate to the termination and could have been raised in a timely challenge to the termination.  In addition, Plaintiff does not demand specified monetary damages tied to its 2017 claim but instead seeks damages "in an amount to be proven at trial."  Id. at ¶ 105; Securiforce, 879 F.3d at 1359-60 ("We have explained that for monetary claims, the absence of a sum certain is 'fatal to jurisdiction under the CDA.'" (internal citations omitted)).  To support its claim, Plaintiff cites Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988), but Malone dealt with a nonmonetary defense to a termination for default, which did not need to be presented to a contracting officer as a separate monetary claim.  ECF No. 54 at 18; see also Securiforce, 879 F.3d at 1362-63.

As such, Count III of Plaintiff's Second Amended Complaint is dismissed.

### Unpaid Invoices

In Count I, Plaintiff requests $89,054 in unpaid invoices, stating that it completed all work and provided all supplies necessary to support five invoices.  Second Am. Compl. ¶¶ 80-82; see also ECF No. 64-1 at 11.  In Pay Estimate #5, Plaintiff had requested $877,477.02 of the $1,204,902 contract price, but the Government only paid Plaintiff $788,423.01.  ECF No. 64-1 at 11; Second Am. Compl. ¶¶ 81-82; Oral Arg. Tr. at 22-24.  The Government does not dispute it withheld $89,054.  See ECF No. 43 at 10; Oral Arg. Tr. at 22-24.

Defendant acknowledges that a contractor whose contract was terminated for default is entitled to payment for the value of work it had performed as of the time of the termination.  ECF No. 43 at 10 (citing FAR 49-402-2(a) and J.G. Enters., Inc., ASBCA No. 27150 83-2 BCA ¶

16,808). Regarding the $89,054 in unpaid invoices, however, Defendant posits that it retained this amount because the Government determined that Plaintiff had not completed certain items it had invoiced in Pay Estimate #5. ECF No. 43 at 10.

While there is a dispute as to whether Plaintiff is entitled to recover the amount withheld, Plaintiff has stated a claim for the $89,054, and the Court has jurisdiction to entertain that claim. As such, the Government's motion to dismiss this claim is denied.

**Vague Claims**

In Count I, Plaintiff seeks $451,458.78 in damages "incurred as a result of Government direction, as a result of the Government's poor planning and contract mismanagement, and/or as a result of differing site conditions." Second Am. Compl. ¶ 83; see ECF No. 64-1 at 9. In its supplemental brief, Plaintiff states that these damages are the result of "the Government's delays, 'defective specifications' and 'differing site conditions.'" ECF No. 72 at 6. Plaintiff has failed to segregate what damages it suffered as a result of alleged defective plans and specifications, differing site conditions, and delays. Rather, Plaintiff asserts that the claims listed in the 2017 claim and Second Amended Complaint (i.e., survey error, work performed by its subcontractors, additional supervisor labor, extended overhead, stump removal, purchase of erosion and stabilization fabric, and additional clearing work) were all caused by defective plans and specifications, differing site conditions, and delay without allocation or any attempt to quantify which components of damages were attributable to which Government conduct.

Plaintiff's demand for $451,458.78 in Count I of its Second Amended Complaint is comprised of:

| | |
|---|---|
| $751.00 | Survey error |
| $27,117.00 | In-scope work performed by subcontractor Pelland-Swenson, which is owed and payable under the Contract |
| $20,000.00 | In-scope work performed by subcontractor Sjoblom Landscape, which is owed and payable under the Contract |
| $11,646.45 | Additional Supervisor labor specifically requested by and at the direction of the Government |
| $26,620.64 | Extended overhead |
| $200,000.00 | Stump removal, at the approved unit price |
| $9,138.00 | Purchase of perishable erosion fabrics, at the approved unit price and as directed by the engineer |
| $6,000.00 | Additional clearing work, at the approved unit price |
| $20,000.00 | Purchase of Stabilization Fabric, at the approved unit price |

| | |
|---|---|
| $57,123.39 | Lost profit on balance of incomplete work[5] |
| $73,062.30 | Home office overhead[6] |
| **$451,458.78** | **Total** |

Second Am. Compl. ¶ 83.

Had Plaintiff successfully challenged the termination for default in a timely appeal to this Court or the cognizant board, it may have been able to recover some of the costs it is seeking here in a termination for convenience settlement. Best Foam Fabricators, Inc. v. United States, 38 Fed. Cl. 627, 638 (1997) ("A termination for convenience essentially converts a fixed price contract into a cost reimbursement contract. As such, the contractor is entitled to recover all allowable costs incurred in the performance of the terminated work, a reasonable profit on the work done, and certain additional costs associated with the termination." (internal citations omitted)); Nicon, Inc. v. United States, 331 F.3d 878, 885 (Fed. Cir. 2003) (stating that "the overall purpose of a termination for convenience settlement is to fairly compensate the contractor and to make the contractor whole for the costs incurred in connection with the terminated work," which may include unabsorbed overhead); White Buffalo Constr., Inc. v. United States, 52 Fed. Cl. 1, 4 (2002) ("When a fixed-price contract is terminated for convenience, it is essentially converted into a cost reimbursement contract" and the contractor is "'entitled to recover all allowable costs incurred in the performance of the terminated work, a reasonable profit on the work done, and certain additional costs associated with the termination.'" (quoting Best Foam, 38 Fed. Cl. at 638)); see generally John Cibinic, Jr., James F. Nagle, & Ralph C. Nash, Jr., Administration of Government Contracts 966 (5th ed. 2016) (stating that convenience termination clauses "require the government to pay the contractor the costs incurred in performing the terminated work, the costs of settling and paying settlement proposals under terminated subcontracts, and a fair and reasonable profit on work performed").

However, in this case, claims for costs which would have been included in a convenience termination settlement cannot now be resurrected as separate claims, as they would have necessarily been subsumed in relief granted in a timely challenge to the termination for default. The remedy for a successful challenge to a termination for default is a conversion of the default termination to a termination for the convenience of the government which carries with it a monetary remedy -- termination for convenience damages. Any monetary claims which would

---

[5]  Plaintiff also raised this claim in Count II. Second Am. Compl. ¶ 93. As explained above, the Court dismisses this claim.

[6]  In its Second Amended Complaint, Plaintiff seeks $73,062.30 for home office overhead and in its supplemental brief states this overhead is "due to delays and defective plans/specifications," but does not provide further context. Second Am. Compl. ¶ 83; ECF No. 72 at 7. Plaintiff did not include a claim for home office overhead in the 2017 claim, and its claim for home office overhead was never presented to the contracting officer. See ECF No. 64-1 at 11. As such, this Court lacks jurisdiction over Plaintiff's request for home office overhead. Scott Timber Co., 333 F.3d at 1365.

have been encompassed within a termination for convenience settlement are time-barred and may not be raised years later to start the statute of limitations clock afresh.

Plaintiff appears to suggest that its 2017 monetary claims raise different theories than a challenge to the default termination. ECF No. 72 at 5-6; ECF No. 54 at 13-16. However, once a contract has been terminated for default -- a conclusion which stands in this case as a matter of law since Plaintiff failed to timely challenge the termination -- the contractor's ability to recover under the contract is limited. See Laka Tool & Stamping Co. v. United States, 227 Ct. Cl. 468, 471-72 (1981).

Defendant relies upon Laka Tool & Stamping Co. v. United States, 227 Ct. Cl. 468 (1981), to argue that a timely monetary claim may only proceed if it is separate and distinct from an untimely challenge to a termination for default. Oral Arg. Tr. at 13-14; ECF No. 74 at 5. In Laka Tool, the Court of Claims permitted a defaulted contractor to recover costs "expended in attempting to comply with the original impossible specifications" unrelated to the subsequent termination for default -- which occurred under modified specifications. Laka Tool, 227 Ct. Cl. at 469. The Court of Claims reasoned that separate and apart from circumstances leading to the termination, Plaintiff had wasted its effort attempting to comply with the original impossible specifications and awarded reliance damages. According to Defendant, Laka Tool's "very rarely invoked, equitably-based exception allowing for a contractor indisputably in default to recover damages notwithstanding the plain language of the default clause" only applies "where there is no overlap between the claim and the operative facts of the default termination." ECF No. 74 at 8.[7] Defendant contends that Plaintiff cannot prevail on monetary claims for alleged delay, defective specifications, and differing site conditions as these would have been defenses to the default termination and would require the Court to conduct the same inquiries and review the same operative facts as if it were reviewing the termination decision. Id. at 12-16. Defendant continues that Plaintiff in raising these defenses now, "[u]nder the guise of an affirmative monetary claim," is attempting "to escape the consequences of its unexplained failure to timely appeal its now final, conclusive, and unappealable termination for default." Id. at 14.

The record reflects that Plaintiff had been complaining about inadequate plans, differing site conditions, and the Government's delay in clarifying or modifying the plans and specifications as early as August 26, 2012, when it informed the Government that it had "been waiting for [the Government] to decide the slopes," there was "insufficient fill on-site to bring the slopes to required lines and grades," and the plans were "inadequate."[8] ECF No. 64-1 at 6-7. Plaintiff made

---

[7]  Plaintiff erroneously makes a sweeping argument that Laka Tool does not apply when the contractor has partially performed under the contract, citing Roxco, Ltd. v. United States, 60 Fed. Cl. 39, 46 (2004). Roxco is nonbinding, and to the extent Roxco could be interpreted to stand for the broad proposition Plaintiff espouses, this Court would reach a different conclusion.

[8]  In its 2017 claim and Second Amended Complaint, Plaintiff does not allege the basis of a delay claim, state how many days of delay it is claiming, or specify which monetary damages are associated with such a claim. Plaintiff first raises a claim for 146 days of delay for "additional work caused by differing site conditions" and the Government's failure to "adequately respond to requests for clarification regarding conflicting directives" in its response to Defendant's motion to dismiss. ECF No. 54-5 at 41-42. Any purported claim for 146 days of delay was not presented to

15

similar complaints in its responses to the Government's cure notice on September 12 and September 13, 2012. ECF No. 71-1 ("You have yet to respond to our letter requesting detailed information on how to modify the grade and slopes. . . . If you want it installed per incorrect plans, then you will need to state it so. . . . You are holding up this project - act accordingly."); ECF No. 71-2 ("We have at no time agreed to coordinate layout of lines and grades with Inspector. . . . Since this constitutes more delay on your part we are claiming delay by the Government under Section 52.242-14 of the contract."). The Government, however, rejected Plaintiff's arguments, and the issue of alleged defective plans and specifications, differing site conditions, and delay were squarely contested by the parties prior to termination. Based on the current record, it appears that these contentions were related to the termination for default -- unlike the impossible specifications in Laka Tool -- and the time for Plaintiff to have raised these issues was in a timely appeal of the termination for default decision.

As the Court in Laka Tool found, "should plaintiff be properly terminated for default without making any acceptable deliveries . . . , it would get nothing for the original work." Id. at 472; see In re Berlin, ASBCA No. 53549, 03-1 BCA ¶ 32,075 (stating a defaulted contractor may not recover "anticipated profit on either unperformed or unaccepted work" but "may recover for changed work incorporated into end items delivered to and accepted by the Government" and "'wasted work' attempting to comply with impossible specifications"); J.G. Enters., Inc., ASBCA No. 27150, 83-2 B.C.A. ¶ 16808 ("Under a construction contract terminated for default, the contractor is entitled to payment for value of work in place it performed at the time of termination. However, if the amount remaining of the contract price is insufficient to cover the Government's cost to complete and the liquidated damages, if assessed, the payment to the contractor is reduced by the excess amount.").

Here, Plaintiff's litany of the monetary claims comprising Count I, set forth below, are vague, and the Court cannot ascertain whether they are viable.

### Survey Error

In this action, Plaintiff claims that it incurred $751 to procure a "surveyor to correct plan errors." ECF No. 72 at 6. Plaintiff alleges that it had completed bid item #4, construction survey and staking, in Pay Estimate #5 submitted to the Government on September 5, 2012. The Government disputed that Plaintiff completed this bid item in its response to Plaintiff's pay application. ECF No. 43-1 at Appx. 32.

The cure notice requested that Plaintiff "[e]mploy the services of a Minnesota licensed surveyor for surveying and measuring quantities." ECF No. 87 at 2. In his decision terminating the contract for default, among the performance defects that Plaintiff failed to cure, CO Allen listed:

> f. Employ the services of a Minnesota licensed surveyor for surveying and measuring quantities.
>
>    . . .

---

the Contracting Officer and may not now be brought before this Court. Scott Timber, 333 F.3d at 1365.

> Grade finishing stakes are only partially installed, with gaps in the survey where no grade finishing stakes are installed.
>
> Toe of slopes are not surveyed.

ECF No. 73-4 at 3.  In its 2017 claim, Plaintiff included $751 for "survey mistake" in its damages table but did not articulate what that mistake was, who made it, or why Plaintiff is entitled to compensation when surveying was stated to be a performance defect underlying the termination for default.  ECF No. 64-1 at 11; see Second Am. Compl. ¶ 56.

### In-Scope Work Performed by Subcontractors Pelland-Swenson and Sjoblom Landscape

Plaintiff requests $27,117 for work performed by its subcontractor, Pelland-Swenson, and $20,000 for work performed by its subcontractor, Sjoblom Landscape.  Second Am. Compl. ¶ 83; see also ECF No. 64-1 at 11 (requesting $25,000 for "[a]dditional work performed by Sub-contractors Pelland-Swenson" and $25,000 for "Sub-contractor Sjoblom Landscape").  Plaintiff did not provide further information about these claims.  See ECF No. 72.

### Additional Supervisor Labor

In this action, Plaintiff requests $11,646.45 for "additional Supervisor labor specifically requested by and at the direction of the Government."  Second Am. Compl. ¶ 83.  The Court cannot ascertain what this work entailed.  Plaintiff's 2017 claim includes supervisor costs for 15 days plus vehicle costs totaling a different amount -- $18,750, stating:

| 6 | Supervisor (Start 09/20, $1000/day, plus $250/day-vehicle)<br>• 09/24 – 09/28 = 5 days<br>• 10/01 – 10/05 = 5 days<br>• 10/08 – 10/12 = 5 days<br>• 15 days @ $1250 | *Clause to be included* | $18,750.00 |
|---|---|---|---|

ECF No. 64-1 at 11.

### Extended Overhead

In its Second Amended Complaint, Plaintiff seeks $26,620.64 in extended overhead due to "the Government's poor planning and contract mismanagement[] and/or as a result of differing site conditions."  Second Am. Compl. ¶ 83.  In its 2017 claim, Plaintiff requested a different amount -- $20,000 -- for "Extended OH" including "Carl time" and "TC stuff."  ECF No. 64-1 at 11.  In its original Complaint, Plaintiff also requested $20,000 in extended overhead.  Compl. ¶ 83.  Based on this record, it is not clear what Plaintiff's requested extended overhead encompasses.[9]

---

[9] Plaintiff did not clarify the basis for its claim for extended overhead in its supplemental brief.  Plaintiff alleges no time frame for its extended overhead claim in either the 2017 claim or this action, but appears to attempt to raise a new 146-day delay claim in its response to Defendant's motion to dismiss and supplemental brief -- a claim it failed to mention in either its 2017 claim or Second Amended Complaint.

### **Stump Removal**

The largest portion of Plaintiff's Count I damages is $200,000 for stump removal. Second Am. Compl. ¶ 83; ECF No. 64-1 at 11 (requesting $200,000 for "Stump Removal (500 X $400)"). The 2017 claim does not state when or where the stump removal took place. The bid schedule listed an estimated quantity of 50 stumps for line item 6, stump removal. ECF No. 73-3 at 3. The Government estimated it would cost a contractor $75 to remove a stump, yielding a total of $3,750. Id. Plaintiff's bid for this line item was originally $2,000, which equates to $40 per stump, but was corrected to $20,000 in the Contract, which equates to $400 per stump. ECF No. 73-3 at 2, 4. In its September 25, 2012 pay estimate table provided with its motion to dismiss, the Government states the line item amount for stump removal was $20,000, but that this bid item was deobligated. ECF No. 43-1 at Appx. 34.[10] Even after the Court directed Plaintiff to clarify its claims in its supplemental brief, Plaintiff continued to claim $200,000 for stump removal without explanation. ECF No. 72 at 6.

It is Plaintiff's obligation to articulate an accurate factual basis for its claim, as reflected in the mandatory certification for claims above $100,000. Here, Plaintiff's principal executed the following certification:

> I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; <u>that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable</u>; and that I am duly authorized to certify the claim on behalf of the contractor.

ECF No. 64-1 at 12 (emphasis added). Such a "certified claim may be a source of liability under both the Contract Disputes Act and the False Claims Act" as the "purpose of the certification requirement is to trigger[] a contractor's potential liability for a fraudulent claim under section [7103] of the [Contract Disputes] Act." <u>Daewoo Eng'g & Constr. Co. v. United States</u>, 557 F.3d 1332, 1340-41 (Fed. Cir. 2009); <u>see also</u> <u>Veridyne Corp. v. United States</u>, 758 F.3d 1371, 1382 (Fed. Cir. 2014); <u>Hanover Ins. Co. v. United States</u>, 134 Fed. Cl. 51, 64-65 (2017).

### **Purchase of Perishable Erosion and Stabilization Fabrics**

Plaintiff requests $9,138 for perishable erosion fabrics and $20,000 for stabilization fabric. Second Am. Compl. ¶ 83; ECF No. 64-1 at 11 (requesting $8,859 for "[e]rosion fabrics - perishable" and $20,000 for "Roof Fabric"); <u>see also</u> ECF No. 43-1 at Appx. 34. It is not clear from the record whether these fabrics were accepted by the Government or incorporated into work performed by Plaintiff.

---

[10]   The draft contracting officer's final decision states that "Stump Removal was listed on the Bid Schedule as Line Item 6, 500 units @ $40 per unit, or $20,000, not $200,000 as listed in the Claim. This Line Item was removed on Contract Mod #02 signed by Contractor and dated April 27, 2012." ECF No. 37-7 at 5.

The Government represented that it has not looked "into the nuts and bolts" of this draft decision and that the analysis "does not represent the analysis from the agency, as such would be if the contracting officer's final decision had been issued." Oral Arg. Tr. at 33-34.

### Additional Clearing Work

The circumstances underlying Plaintiff's demand for $6,000 for "additional clearing work" are vague. Second Am. Compl. ¶ 83; ECF No. 64-1 at 11 (requesting $6,000 for "[a]dditional clearing - 2 acres @ $3,000 each"). The Government appears to have withheld $6,000 for clearing work in Pay Estimate #5, and it is not clear whether this was incorporated in Plaintiff's $89,054 claim for unpaid invoices. ECF No. 43-1 at Appx. 34. Plaintiff does not allege when the clearing work was performed or what areas were cleared prior to termination.

### Conclusion

Defendant's motion to dismiss is **GRANTED IN PART**. Defendant's motion is **DENIED** as to Plaintiff's claim for unpaid invoices.

The Court dismisses Plaintiff's claims as follows:

- Count I to the extent it requests $57,123.39 for lost profits on balance of incomplete work and $73,062.30 for home office overhead;
- Count II in its entirety; and
- Count III in its entirety.

Given that this is a Rule 12(b)(1) motion, discovery has been conducted,[11] and the Court requires additional evidence to resolve the instant motion, Plaintiff shall:

(1) submit a proffer for each remaining claim it intends to pursue in this action separately attaching supporting documentation, setting forth when each item was performed or purchased, and whether the Government accepted the work or item; and

(2) show cause why each demand remains a viable claim given the termination for default:

- $751 for survey error;
- $27,117 in in-scope work performed by subcontractor Pelland-Swenson;
- $20,000 in in-scope work performed by subcontractor Sjoblom Landscape;
- $11,646.45 in additional Supervisor labor requested by the Government;
- $26,620.64 for extended overhead;
- $200,000 for stump removal;
- $9,138 for the purchase of perishable erosion fabrics;
- $6,000 in additional clearing work; and
- $20,000 for the purchase of Stabilization Fabric.

ECF No. 72 at 6-7.

---

[11] Defendant did not file its motion to dismiss until March 16, 2020, almost four months after initial fact discovery closed. Expert discovery was scheduled to conclude in October 2020.

Defendant shall file the reprocurement contract, including its statement of work, forthwith.

Plaintiff shall submit its proffer and response to this show cause order by **June 28, 2021**.

The Court will conduct a telephonic status conference on **June 30, 2021, at 2:00 p.m. EDT** to schedule further proceedings, including Defendant's response to Plaintiff's proffer and show cause submission.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Senior Judge**
